## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **JOHN F. KENNEDY**, *solely in his capacity as Receiver for the Receivership Estate of Education Corporation of America, Virginia College, LLC, and New England College of Business and Finance, LLC,* **and MONROE CAPITAL MANAGEMENT ADVISORS, LLC,**<br><br>             *Plaintiffs,*<br><br>**v.**<br><br>**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA,**<br><br>             *Defendant.* | **CIVIL ACTION NO.**<br>**5:24-cv-00082-TES** |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S PARTIAL MOTION TO DISMISS

In December 2018, when the Education Corporation of America ("ECA") closed and shuttered its 71 campuses across the country, 21 of them became sites of extensive theft (looting, really) to the tune of more than $6 million in alleged losses. [Doc. 1, ¶ 1]. Correct in what you likely assumed to be the case, this is an insurance-coverage dispute. Plaintiff Monroe Capital Management Advisors, LLC ("Monroe"), a purported senior secured lender and collateral agent of ECA, filed insurance claims for the losses suffered on those 21 campuses. [*Id.* at ¶¶ 5, 178]. ECA's insurer, National Union Fire Insurance Company of Pittsburgh PA ("National Union"), however, rejected the claims on

grounds that *the Receiver* for ECA's receivership estate needed to assert them, not Monroe.[1] [*Id.* at ¶ 185].

At one point, National Union "agreed in writing to toll the statute of limitations for a suit to be brought under the [insurance] [p]olicy to February 28, 2023." [*Id.* at ¶ 189]. However, when National Union wouldn't agree to any further extensions, the Receiver and Monroe filed suit. *See* [*Id.* at ¶ 193]; Complaint, *Kennedy v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 5:23-cv-00080-TES (M.D. Ga. Feb. 28, 2023), ECF No. 1. Following a motion to dismiss, the Receiver and Monroe filed an Amended Complaint. Amended Complaint, *Kennedy v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 5:23-cv-00080-TES (M.D. Ga. May 23, 2023), ECF No. 14. Ultimately, the Receiver voluntarily dismissed that case. *See* Notice of Voluntary Dismissal, *Kennedy v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 5:23-cv-00080-TES (M.D. Ga. Sept. 11, 2023), ECF No. 30. This is the

---

[1] National Union points out to the Court that the policy "unambiguously states that it is 'for the **Insured's** benefit only' and 'provides no rights or benefits to any other person or organization[.]" [Doc. 5-1, p. 24]; [Doc. 5-2, p. 43]. In response, Monroe doesn't argue otherwise—in no way does Monroe ever contend that it *is* the "**Insured**" under the policy. *See* [Doc. 12, pp. 17–18]. Instead, Monroe argues that the Complaint and the Court's Supplemental Order in the underlying receivership case confers the standing Monroe needs to bring this lawsuit along with the Receiver. [Doc. 12, p. 17]; [Doc. 1, ¶¶ 178-81]; *see also* Supplemental Order, *VC Macon GA, LLC v. Va. Coll. LLC*, No. 5:18-cv-00388-TES (M.D. Ga. Dec. 13, 2018), ECF No. 104. Notwithstanding the Supplemental Order, it will give way since the terms of the insurance policy are clear and valid under Georgia law. *See* [Doc. 5-1, p. 24 (citing *Fournier v. Hartford Fire Ins. Co.*, 862 F. Supp. 357, 360, 362–63 (N.D. Ga 1994))]. Since only the Receiver for ECA, as the insured, has standing to bring the claims asserted in the Complaint, the Court **DISMISSES** the claims as asserted by Monroe "in their entirety" for lack of standing. *See W. All. Bank v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 15-cv-03429-PSG, 2016 WL 641648, at *3 (N.D. Cal. Feb. 18, 2016) (noting that a security interest does not confer standing to bring a claim); [Doc. 5-1, p. 25]. Consequently, the Clerk of Court shall **TERMINATE** Monroe Capital Management Advisors, LLC as a party to this case.

renewal[2] of that previously dismissed case.

In this Complaint, each count encompasses the 21 notices of claims and proofs of loss that the Receiver made to National Union. [*Id.* at ¶¶ 184–185]. While Count III seeks a declaratory judgment, Counts I and II, respectively, assert that National Union breached the insurance policy it issued to ECA by denying coverage in bad faith. [*Id.* at ¶¶ 196–215].

Before the Court is National Union's Partial Motion to Dismiss [Doc. 5] in which it relies heavily on an opinion from the Eleventh Circuit detailing a two-step process to determine whether a complaint survives a motion to dismiss. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). National Union takes a hard and rather nuanced stance with respect to the pleading sufficiency of the Receiver's allegations in his operative pleading—a stance that Federal Rule of Civil Procedure 12(b)(6), the Supreme Court, and this Circuit's binding precedent unquestionably permits it to take. In seeking partial dismissal of the Complaint, National Union argues, "Plaintiffs wholly fail to plausibly plead that there is coverage for the vast majority for the underlying claims[.]" [Doc. 5-1, p. 7]. To be sure, National Union concedes that the Receiver has "plausibly alleged that there may be coverage under" the policy for three notices of claims; therefore, as discussed below, those individual notices of claims are not subject to

---

[2] Georgia law allows a plaintiff to recommence a previously dismissed suit—notwithstanding the statute of limitations—so long as the renewal action is filed within six months of the earlier dismissal. *See* O.C.G.A. § 9-2-61.

dismissal. [*Id.* at p. 14]. The Receiver, however, contends that his Complaint contains sufficient detail to enable *all* 21 notices of claims to go forward. [Doc. 12, p. 3].

## LEGAL STANDARD

When ruling on a motion under Rule 12(b)(6), it is a cardinal rule that district courts must accept the factual allegations set forth in a complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). In accepting the factual allegations as true, courts are to construe the reasonable inferences from them in the light most favorable to the plaintiff. *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998).

However, through Rule 12(b)(6), a defendant may "test the facial sufficiency" of a complaint by way of a motion to dismiss. *Ghee v. Comcast Cable Commc'ns, LLC*, No. 22-12867, 2023 WL 3813503, at *2 (11th Cir. June 5, 2023) (quoting *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1368 (11th Cir. 1997)). Such a "motion is an 'assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint still fails as a matter of law to state a claim upon which relief may be granted.'" *Barreth v. Reyes 1, Inc.*, No. 5:19-cv-00320-TES, 2020 WL 4370137, at *2 (M.D. Ga. July 29, 2020) (citation omitted). However, a complaint will survive a Rule 12(b)(6)-based motion if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough*, 907 F.3d at 1333 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

Now, whether a complaint states a claim for relief is measured by reference to

the pleading standard of Federal Rule of Civil Procedure 8—a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Barreth*, 2020 WL 4370137, at *2 (citation omitted). Rule 8 doesn't require detailed factual allegations, but it does require "more than unadorned, the-defendant-unlawfully-harmed-me accusations." *McCullough*, 907 F.3d at 1333 (citation omitted) (alterations adopted). Its sole purpose is to provide a defendant "with 'fair notice' of the claims and the 'grounds' for entitlement to relief." *Barreth*, 2020 WL 4370137, at *2 (citation omitted); *Twombly*, 550 U.S. at 555–56.

As National Union contends, courts use a two-step framework to decide whether a complaint survives a motion to dismiss. *McCullough*, 907 F.3d at 1333 (citation omitted). The first step is to identify the allegations that are "no more than conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* "A court decides whether [Rule 8's pleading standard] is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that [a] plaintiff is entitled to the legal remedy sought." *Barreth*, 2020 WL 4370137, at *2 (citation omitted).

When drafting a complaint, "[a] plaintiff must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (quoting *Twombly*, 550 U.S. at 555). A plaintiff may use legal conclusions to structure a complaint, but they "must be supported by factual allegations." *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a motion to dismiss, must take all of the factual allegations in a complaint as true, they are not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

The issue to be decided when considering a motion to dismiss "is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) *overruled on other grounds by Davis v. Scheuer*, 468 U.S. 183 (1984). The issue is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Id.* The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" and cannot "merely create[ ] a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 555. Finally, and in this case, critically, a complaint that tenders "'naked assertions' devoid of 'further factual enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550

U.S. at 557) (cleaned up). To survive, a complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

## DISCUSSION

Consistent with *McCullough*'s two-step framework, the Court will identify and discard anything from the Receiver's Complaint that is a conclusory allegation masquerading as fact. 907 F.3d at 1333. Then, with whatever *factual allegations* that remain, the Court will, of course, accept them as true and determine whether they give rise to *plausible* claims that "unlock the doors of discovery." *Id.*; *Iqbal*, 556 U.S. at 678–79. Once the Court details the relevant provisions of the insurance policy, most of the Court's discussion is essentially a thorough sifting of the Receiver's Complaint. In making its ruling, the Court looks at how the factual allegations measure up against the agreed-upon requirements from those provisions. If the Receiver doesn't or can't comply with what's required for a specific notice of claim, then there's likely nothing he could do to save it. Is this a rather stringent take at such an early stage of litigation? Absolutely. But, it's the hurdle that the Receiver now faces based on how National Union framed its arguments and efforts to whittle down his various claims.

A.    <u>**The National Union Insurance Policy**</u>[3]

National Union issued ECA an insurance policy for the period between September 3, 2018, through September 3, 2019, to cover, among other things, ECA's tangible property "in all of the premises where it conducted business." [Doc. 1, ¶ 30]. The two relevant provisions—or sections—from the policy deal with coverage from crimes. [*Id.* at ¶¶ 31–36].

The first one, Insuring Agreement 1.A., covers ECA for losses due to theft from its employees. [*Id.* at ¶ 31]. Under this section, National Union, as

> [t]he **Insurer** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from **Theft**[4] committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

[*Id.*]; *see also* [Doc. 5-2, pp. 27, 32]. Unlike the policy's definition for "**Theft**," or its definitions for "**Robbery**," or "**Custodian**," discussed below, the term "**Employee**" has several components. Under subparagraph (2)(e) of the policy, "**Employee**" is defined as

> (i) any natural person: (1) while in the **Insured's** service and for sixty (60) days after the termination of service, unless such termination is due to **Theft** or any dishonest act committed by the **Employee**; (2) who the **Insured** compensates directly by salary, wages or commissions; and (3) who the **Insured** has the right to direct and control while performing

---

[3] National Union filed a copy of the policy as an exhibit to its Motion. *See generally* [Doc. 5-2]. As the Eleventh Circuit recently clarified, for a document to be considered on a motion to dismiss, it must be "(1) central to the plaintiff[s'] claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024). The policy is obviously central to the claims in this case, and neither party disputes its authenticity. Therefore, the Court will cite directly to the policy document as needed.

[4] "'**Theft**' means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of the **Insured**. Solely with respect to Insuring Agreement 1.A., **Theft** shall also mean forgery." [Doc. 5-2, p. 32].

services for the **Insured**;

(ii) any natural person who is furnished temporarily to the **Insured**: (1) to substitute for a permanent **Employee**, as defined in subparagraph 2(e)(i) above, who is on leave; or (2) to meet seasonal or short-term work load conditions; while that person is subject to the **Insured's** direction and control and is performing services for the **Insured**, excluding, however, any such person while having care and custody of property outside the **Premises**; or

(iii) any natural person who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, to perform duties related to the conduct of the **Insured's** business, but does not mean a temporary **Employee** as defined in subparagraph 2(e)(ii) above;

(iv) any natural person who is: (1) a trustee, officer, employee, administrator or manager, except who is an independent contractor, of any **Employee Benefit Plan**; and (2) the **Insured's Manager** while that person is handling **Money** and **Securities** or **Other Property** of any **Employee Benefit Plan**.

(v) any natural person who is a former **Employee**, partner, **Member**, **Manager**, director or trustee retained as a consultant while performing services for the **Insured**;

(vi) any natural person who is a guest student or intern pursuing studies or duties;

(vii) any **Employee** of any entity merged or consolidated with the **Insured** prior to the effective date of this **Crime Coverage Section**;

(viii) any of the **Insured's Managers**, directors, trustees or non-compensated officers while: (1) performing acts within the scope of the usual duties of an **Employee**; or (2) acting as a member any committee duly elected or appointed by resolution of the **Insured's** board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on the **Insured's** behalf; or

(ix) any non-compensated natural person other than one who is a fund solicitor, while performing services for the **Insured** that are usual to the

9

duties of an **Employee**.

[Doc. 5-2, pp. 29–30]. Finally, the term "**Employee**" "does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in this Paragraph (e)." [*Id.* at p. 29].

The second provision, Insuring Agreement 1.D, covers ECA for losses due to robbery. [Doc. 1, ¶ 35]. Here, National Union, as

> [t]he **Insurer** will pay for loss of or damage to **Other Property** . . . inside the **Premises** resulting directly from an actual or attempted **Robbery**[5] of a **Custodian**[6][.]

[*Id.* at ¶ 36]; *see also* [Doc. 5-2, p. 28].

### B.    The Receiver's Claim for Breach of Contract

Relying on these two policy provisions, the Receiver alleges that National Union breached the policy. [Doc. 1, ¶¶ 196–205]. If he can reach discovery on all 21 claims, he will shoulder the burden to prove that each notice of claim falls within either Insuring Agreement 1.A., Insuring Agreement 1.D, or both. *Travelers Home & Marine Ins. Co. v. Castellanos*, 773 S.E.2d 184, 186 (Ga. 2015) (reiterating the principle that, under Georgia law, "an insured claiming an insurance benefit 'has the burden of proving that a claim

---

[5] "'**Robbery**' means the unlawful taking of property from the care and custody of a person by one who has . . . caused or threaten to cause that person bodily harm[] or . . . committed an obviously unlawful act witnessed by that person." [Doc. 5-2, p. 31].

[6] "'**Custodian**' means the **Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor." [Doc. 5-2, p. 29].

falls within the coverage of the policy[]'"). The Complaint doesn't identify which Insuring Agreement covers which specific claim. So, the Court will parse through the allegations used to support all 21 notices of claims to see which ones could fall under which Insuring Agreement.

### 1.    Insuring Agreement 1.A

Easy ones first. National Union does not contest that the Receiver "ha[s] plausibly alleged that there may be coverage" for three notices of claims under Insuring Agreement 1.A. [Doc. 5-1, pp. 14, 17]. For those notices, here's what he alleges.

### a.    Virginia College in Birmingham, Culinary School

Verbatim, the Receiver's First Complaint states:

> At the Virginia College in Birmingham, Culinary School, on the final day of school, December 18, 2018, two ECA employees Dennis Sanders and Brandon Fee, witnessed a third ECA employee, Jared Danks, removing culinary equipment from the premises into a truck.

> Mr. Sanders, the Director of Facilities in charge of the care and custody of ECA's property inside the premises, confronted Mr. Danks who responded that everyone else was taking equipment, so why was it a problem that he did it. When Mr. Sanders pressed Mr. Danks on who gave him authority to remove the equipment, Mr. Dankes ignored him and continued with the theft.

> Over the next few days, ECA employees attempted to convince Mr. Danks to return the equipment. When Mr. Danks ultimately refused, Mr. Sanders and ECA employee John Carson filed a police report detailing the equipment Mr. Sanders observed Mr. Danks stealing. . . .

[Doc. 1, ¶¶ 42–44]. As National Union concedes, those factual allegations are certainly sufficient to plausibly allege that "**Theft** [was] committed by an **Employee**," "*acting*

*alone*" as contemplated by Insuring Agreement 1.A. [Doc. 5-2, p. 27] (emphasis added);

[Doc. 5-1, p. 14]; *McCullough*, 907 F.3d at 1333.

In addition to Insuring Agreement 1.A, National Union doesn't contest—"[f]or

this stage of the case only"—that the Receiver has plausibly alleged that coverage may

also exist under Insuring Agreement 1.D since the thefts that occurred at the Culinary

School were witnessed by an ECA employee "in charge of the care and custody of

ECA's property inside the [school]." [Doc. 5-1, p. 17]; [Doc. 1, ¶ 43].

### b.     Brightwood College – Charlotte

Similarly,

> [a]t the Brightwood College – Charlotte – the landlord observed people
> removing property and furniture—including computers, audio-visual
> equipment, and simulators—from the campus beginning December 5, 2018,
> and for a few days thereafter.
>
> The police were called and investigated. They learned that the campus
> president (an ECA employee), who was in charge of the care and custody
> of the ECA's property inside the premises, had colluded with the
> unidentified thieves to accomplish the thefts.
>
> The employee admitted to police she had told her unidentified co-
> conspirators it was okay to remove whatever they wanted. The employee
> did not have authority to authorize the removal of ECA equipment and she
> was acting against explicit management instructions to preserve the assets.
> The employee falsely told the police no police report was required. . . .

[Doc. 1, ¶¶ 49–51]. Again, National Union concedes that these allegations are enough to

survive dismissal for failure to state a claim under Insuring Agreement 1.A when set

against the plausibility standard proscribed by *Twombly* and *Iqbal*. [Doc. 5-1, pp. 14, 17].

Notably, for this specific notice of claim, it may be covered under Insuring Agreement 1.A. because the "**Theft** [was] committed by an **Employee**," "acting . . . *in collusion with* other persons." [Doc. 5-2, p. 27] (emphasis added).

### c.    Brightwood College – Dayton

Finally,

> At Brightwood College – Dayton, the Dean and Assistant Dean of the school were charged with care and custody of the equipment inside the premises. They allowed, even facilitated, the wholesale looting of the location.

> Among the property taken was furniture, medical equipment, a birthing simulator and even HVAC equipment.

[Doc. 1, ¶¶ 55–56]. As to this notice of claim, National Union admits that the factual allegation that the Dean and Assistant Dean "facilitated" the thefts from the Dayton campus is enough to potentially encapsulate "**Theft** committed by an **Employee**," "acting . . . *in collusion with* other persons" as contemplated by Insuring Agreement 1.A. [Doc. 5-2, p. 27] (emphasis added); [Doc. 5-1, pp. 14, 16].

Out of 21 notices of claims, National Union contends that only those three contain sufficient facts to plausibly allege coverage under one or both of the Insuring Agreements and survive. [*Id.* at pp. 14, 17]. So, why does National Union argue that the allegations for the remaining 18 notices of claims don't measure up? In short, it's National Union's position that the Receiver's wording in his Complaint makes his factual allegations so deficient that it truly can't figure out whether the "**Theft**" for the remaining 18 notices of claims was "committed by an **Employee**" per the plain terms of

Insuring Agreement 1.A. [*Id.* at p. 14]; [Doc. 5-2, p. 27].

Despite the conflict over whether coverage exists, the Receiver doesn't stake his case on an argument that the relevant terms of National Union's insurance policy are ambiguous. In fact, both the Receiver and National Union understand the two relevant policy provisions exceedingly well, and—based on the arguments presented for this motion—they appear to have no issues when it comes to their interpretation. They just simply disagree whether the Receiver's factual allegations in his Complaint plausibly state that ECA was "depriv[ed]" of property or had its property taken from its "care and custody" as contemplated by at least one of the two Insuring Agreements. *See* [Doc. 5-2, pp. 31–32].

Before getting to the meat of the outstanding 18 claims, the Court notes that the Complaint filed in this case differs ever-so-slightly from the Amended Complaint in the previous case. But, differences are differences, no matter how small. Namely, the Receiver added a new word to the descriptions of each event. In a normal case, one single word may not matter very much. However, in this case (and at this stage), it ultimately saved these 18 claims from a swift dismissal. What's this magical word? "Colluded." *Compare* [Doc. 1, ¶¶ 62, 68, 73, 79, 85, 91, 97, 103, 109, 115, 121, 127, 133, 139, 145, 151 & 157], *with* Amended Complaint, *Kennedy v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 5:23-cv-00080-TES (M.D. Ga. May 23, 2023), ECF No. 14 at ¶¶ 68, 74, 80, 86, 92, 98, 104, 110, 116, 122, 128, 134, 140, 146, 152 & 158.

In the previous case, the Receiver only used the term "allowed" when describing the actions ECA employees took in relation to the thefts. *See, e.g.*, Amended Complaint, *Kennedy v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 5:23-cv-00080-TES (M.D. Ga. May 23, 2023), ECF No. 14 at ¶ 68 ("Rather than secure the property inside the premises, the ECA employee *allowed* the location to the looted.") (emphasis added).

By using "allowed," the Receiver left open several paths one could take when reading the claims. First, it could mean that the ECA employees tasked with securing ECA's property inside the campus buildings just flat-out failed to implement any security measures on the campuses, which "allowed" thefts to occur. If we took "allowed" to describe this scenario, it could describe negligence (or maybe gross negligence), which isn't covered under the pertinent Insuring Agreements alleged in the Complaint. [Doc. 1, ¶¶ 31–36].

Second, "allowed" could mean that while the ECA employees were securing ECA's property inside the campus buildings, they—perhaps out of ill will because of ECA's closure—merely sat on their hands and didn't even try to stop or otherwise convince people—or other "third-party bad actors" as National Union puts it—from unlawfully walking property right out of the building. [Doc. 5-1, p. 15]; [Doc. 5-2, pp. 31–32]. In what could most likely be characterized as a fairly spiteful scenario, the fact that ECA employees might've carelessly (or even willfully) turned a blind eye to what was happening still doesn't present any reasonable inference that the securing ECA

employees stole any property or colluded with those people or—as with the notice of

claim from Brightwood College – Dayton—actively helped facilitate the theft.

*Hawthorne*, 140 F.3d at 1370; [Doc. 1, ¶ 55].[7]

Third, "allowed" could mean what the Receiver ostensibly wants it to mean: that

the ECA securing employees *told*, *invited*, or—to use the policy's language—"collu[ded]

with other persons" to come into ECA's premises and "unlawful[ly] tak[e]" property

from inside the various campuses. [Doc. 5-2, pp. 27, 31–32]. In this scenario, a

reasonable inference can be made that the "**Theft**" was "committed by an "**Employee**"

"acting in collusion with other persons." [*Id.* at p. 27]; *Hawthorne*, 140 F.3d at 1370.

And, "allowed" on its own, likely wouldn't have saved the 18 contested claims

from dismissal. But, this time around, the Receiver did more. Now, the same claim as

cited above reads: "Rather than secure the property inside the premises, the ECA

employee ***colluded*** with others and *allowed* the location to be looted." [Doc. 1, ¶ 68

(emphasis added)].

The Court is obviously placing a good bit of weight on the term "colluded." And

it does so for good reason. That's because "collusion" is "agreement between two or

more persons to defraud a person of his rights by the forms of law, or to obtain an

---

[7] Notably, neither the first nor the second scenario could fall under Insuring Agreement 1.A, but the second one—assuming the Receiver could truthfully allege such facts—could possibly fall under Insuring Agreement 1.D as a "witnessed" "unlawful act." *See, e.g.*, [Doc. 14, ¶¶ 42–44]; [Doc. 5-2, p. 31]; *Hawthorne*, 140 F.3d at 1370.

object forbidden by law. It implies the existence of fraud of some kind, the employment of fraudulent means, or of lawful means for the accomplishment of an unlawful purpose." *Collusion*, BLACK'S LAW DICTIONARY (4th ed. 1968). But, even more importantly, "collusion" is a word straight from the policy itself. *See* [Doc. 5-2, p. 27 ("[T]he **Insurer** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from **Theft** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.")].

Alleging that an employee colluded with others to commit theft is enough—at this preliminary stage—to plausibly allege coverage under the policy. *See, e.g.*, *Hanson v. Eustace's Lessee*, 43 U.S. 653, 688 (1844) ("But the least degree of concert or collusion between the parties to an illegal transaction, makes the act of one the act of all."); *Rivet v. State Farm Mut. Auto. Ins. Co.*, 316 F. App'x 440, 443 (6th Cir. 2009) ("Where there is evidence that parties are acting in collusion, [e]verything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all.") (citing *Kefuss v. Whitley*, 220 Mich. 67 (1922)); *Swearingen v. Swearingen*, 165 S.W. 16, 19 (Tex. Civ. App. 1914) ("As collusion necessarily implies the participation of both parties, it is impossible to see why one would be less guilty than the other.").

At the end of the day, this case is at the earliest stage in litigation. And, "at this stage, when there are . . . equally plausible ways to read a complaint, we should adopt the reading that is most favorable to [the plaintiffs]." *Worthy v. City of Phenix City, Ala.*,

930 F.3d 1206, 1214 (11th Cir. 2019). Accordingly, the Court **DENIES** National Union's

Motion as to the issue of coverage for the claims under Insuring Agreement 1.A.

### 2.    Insuring Agreement 1.D

Next, National Union argues that only one of the Receiver's claims plausibly

states a claim under Insuring Agreement 1.D—that being the Birmingham Culinary

incident. *See* [Doc. 5-1, p. 17 ("For this stage of the case only, National Union does not

contest that Plaintiffs have plausibly alleged that there may be coverage under Insuring

Agreement 1.D for the Birmingham Culinary Incident.")]. As a refresher, Insuring

Agreement 1.D states:

> [t]he **Insurer** will pay for loss of or damage to **Other Property** . . . inside the
> **Premises** resulting directly from an actual or attempted **Robbery** of a
> **Custodian**[.]

[Doc. 5-2, p. 28]. National Union argues that there are "no allegations that any of the

remaining underlying claims are covered because [the Receiver has not] pled that they

involved a '**Robbery** of a **Custodian**.'" [Doc. 5-1, p. 17]. More specifically, National

Union asserts that simply alleging an employee "observed" people removing property

is not enough. [*Id.*]. In his Response, the Receiver does not engage with National

Union's specific arguments regarding Insuring Agreement 1.D. Instead, he just argues

that "[t]here is no need to discuss the applicability of Insuring Agreement 1.D[.]

National Union concedes that at least one of the claims . . . adequately seeks coverage

under that provision." [Doc. 12, p. 6 n.3]. But that is not the case. The Receiver's

Complaint itself invokes Insuring Agreement 1.D in his breach-of-contract claim. [Doc. 1, ¶ 200]. So, the Court must analyze the claims with Insuring Agreement 1.D in mind to determine if the Receiver states a plausible claim for relief on any claim other than the sole claim National Union acknowledges could be covered.

The Court begins with a few examples. First, the Receiver describes the Brightwood College – Charlotte incident as follows: "At the Brightwood College – Charlotte – the landlord observed people removing property and furniture—including computers, audio-visual equipment, and simulators—from the campus beginning December 5, 2018, and for a few days thereafter." [Doc. 1, ¶ 49]. Next, as to Brightwood College – Dayton, the Receiver alleges: "[T]he Dean and Assistant Dean of the school were charged with care and custody of the equipment inside the premises. They, however, colluded with others and allowed, even facilitated, the wholesale looting of the location." [*Id.* at ¶ 55]. And one last exemplar comes from the Virginia College in Augusta incident, which lays out the following: "ECA placed an employee in charge of the care and custody of the property, shutting down the facility and securing ECA's assets inside the premises through the use of a security skeleton crew." [*Id.* at ¶ 72]. The same language is repeated throughout the remaining claims—ECA placed an employee in charge of the care and custody of the property and then that employee colluded with others to allow the property to be looted, etc.

National Union takes issue with these claims for different reasons.

First, as to the Charlotte incident, it argues that the Complaint fails to allege that the "landlord" was the "**Insured**, or any of the **Insured's** partners or **Members**, or any **Employee** while having care and custody of property inside the **Premises**[.]" [Doc. 5-1, p. 17]. On that claim, the Court agrees. Although the Complaint alleges that the "landlord" witnessed the criminal activity—which could give rise to "robbery" under the policy—the allegations lack sufficient facts to allege that the college charged the "landlord" with the care and custody of the property. That means the Charlotte incident, as alleged, is not covered under Insuring Agreement 1.D.

As for the others, National Union urges that the Complaint fails to allege that "the bad actors 'caused or threatened to cause . . . bodily harm' to an individual with the required 'care and custody' of the property or 'committed an obviously unlawful act witnessed' by an individual with the required care and custody of the property[.]" [Doc. 5-1, p. 18]. The Court agrees. Indeed, the Complaint only alleges that the employees "colluded with others" and "allowed" the lootings and theft. *E.g.*, [Doc. 1, ¶ 62]. That does not allege that an employee faced an attempted or actual robbery as defined in the policy. It is one thing to allege that the employees actively participated in the theft such that Insuring Agreement 1.A could apply. But that same allegation is hard to mold into a claim that the employees faced attempted or actual robbery. In other words, the Complaint, as it stands, does not adequately allege facts that assert alternative theories of employee-facilitated theft versus employee-witnessed robbery. While the Complaint

paints a picture of employees who were at least passive participants in the looting, it does not paint a picture showing robbery of innocent employees. Accordingly, the Court **GRANTS** National Union's Motion as it relates to the Receiver's reliance on Insuring Agreement 1.D for all claims except the Birmingham Culinary incident.

      C.      <u>**Bad-Faith Claims**</u>

National Union argues that the Receiver's bad-faith claim fails for a few reasons. Most notably, it argues Georgia law does not allow a plaintiff to dismiss a suit, send a bad-faith demand letter, and then re-file under the renewal statute.

As a background primer, Georgia law imposes a penalty on insurance companies who—in bad faith—refuse to pay for a loss which is covered by the policy. O.C.G.A. § 33-4-6(a). To bring such a claim, the policyholder must first send a demand notifying the insurance company of an impending bad-faith claim. *Id.* That demand must be sent 60 days before the policyholder files suit claiming damages and fees under § 33-4-6. *Id.* This statute operates as the exclusive remedy for claims of bad faith in the world of insurance-coverage disputes governed by Georgia law. *Anderson v. Ga. Farm Bureau Mut. Ins. Co.*, 566 S.E.2d 342, 345 (Ga. Ct. App. 2002). With that in mind, a successful claim of bad faith depends on whether an insured can prove three requirements—three requirements that are to be strictly construed in favor of insurance companies since successful proof of a violation of § 33-4-6 would impose a penalty on any wayward company. *Am. Safety Indem. Co. v. Sto Corp.*, 802 S.E.2d 448, 456 (Ga. Ct. App. 2017);

*Progressive Cas. Ins. Co. v. Avery*, 302 S.E.2d 605, 606 (Ga. Ct. App. 1983) (noting that

"[p]enalties . . . are not favored[]" and that [t]he right to such recovery must be clearly

shown[]").

National Union asserts the Receiver's claim fails at the outset because it argues

the Receiver's October 25, 2023 letter cannot serve as a demand under § 33-4-6 since it

was not filed pre-suit. To support this argument, National Union points to *Thompson v.*

*Homesite Insurance Co. of Georgia*, 812 S.E.2d 541 (Ga. Ct. App. 2018). In *Thompson*, the

court held that to satisfy the pre-suit demand as outlined in § 33-4-6(a), the demand

must be made before the suit commences. *Id.* at 545 n.3. So far, so good for National

Union's argument. But, upon deeper review of the facts in *Thompson*, the distinction

from this case becomes apparent.

In *Thompson*, the insurance company provided coverage for Thompson's

property, "including coverage for tree and debris removal." *Id.* at 543. After a storm

damaged her property, Thompson filed a claim, and the insurance company sent an

adjuster. *Id.* The insurance company sent Thompson an initial payment based on the

adjuster's report. *Id.* The conflict arose once Thompson and the insurance company

disagreed about the amount due for tree and debris removal. After receiving more

documentation and information, the insurance company provided reimbursement for

the debris removal. *Id.*

In 2012, Thompson filed suit against the insurance company while the appraisal

process for her home damage continued. *Id.* She dismissed the lawsuit in November 2014, but then, in May 2015, filed a renewal action claiming the insurance company "unreasonably delayed reimbursing her for the tree and debris removal expenses and that it had underpaid on the umpire's award, subjecting [the insurance company] to liability under . . . Georgia's bad faith statute." *Id.* The trial court granted the insurance company summary judgment on the bad faith claim because Thompson never complied with the statute's pre-suit demand letter. *Id.* Instead, Thompson only complained to the insurance company, and her counsel sent a demand in July 2013—during the pendency of the original action. *Id.*

The Georgia Court of Appeals affirmed, holding that "despite Thompson's argument to the contrary, we agree with the trial court that this communication does not satisfy the pre-suit demand requirement of § 33-4-6(a) because it was made after Thompson filed suit against Homesite in 2012 and while that suit remained pending." *Id.* at n.3. National Union hangs its hat on the next line: "The fact that Thompson later dismissed the original action and subsequently brought a renewal action claiming bad faith on the basis of the offset does not somehow render her attorney's July 2013 email a *pre-suit* communication within the meaning of § 33-4-6(a)." *Id.* But that cherry-picked line does not hold water when reviewing the relevant facts of this case as compared to *Thompson*. In the end, *Thompson* doesn't go as far as National Union needs.

Instead, the Court looks to *Greer v. Meritplan Insurance Co.*, because it tells a more

analogous story. No. 1:09-CV-2608-JEC, 2011 WL 13269621, at *1 (N.D. Ga. June 15, 2011). *Greer* involved an insurance dispute arising from the burglary of Greer's home. After sending an initial demand letter in March 2008, Greer filed suit in June 2008—later voluntarily dismissing the case. *Id.* at *6. Then, in June 2009, Greer sent another demand letter. *Id.* And, once again, Greer filed suit in September 2009 under Georgia's renewal statute. *Id.* The insurance company argued that "because § 33-4-6 prohibits an insurer from curing its 'bad faith' by paying more than sixty-days after proper demand is made, an insured should not be able to cure its improper demand by dismissing and re-demanding payment." *Id.* at *8. The court rejected this argument, holding that "[w]hile this interpretation may have some logical appeal, it is not supported by the language of the statute or any case law." *Id.* Indeed, as the court explained, under Georgia's renewal statute, a renewed suit "is an action *de novo.*" *Id.* at *7 (citing *Adams v. Gluckman*, 359 S.E.2d 710, 711 (Ga. Ct. App. 1987)).[8] Accordingly, "the failure to satisfy a condition precedent in a voluntarily dismissed action does not bar recovery in a renewal action where the conditions have since been satisfied." *Id.*; *see also Granite State Ins. Co. v. Nord Bitumi U.S., Inc.*, 422 S.E.2d 191, 195 (Ga. 1992) ("The answers to the second question certified to us, then, are yes, the tardy forwarding of suit papers was cured by the voluntary dismissal and refiling of an identical suit, and no, the insurer may not rely

---

[8] *See also Littleton v. Stone*, 497 S.E.2d 684, 686 (Ga. Ct. App. 1998) ("[A] renewal action is a new action, rather than a continuation of the original case[.]").

upon the tardy forwarding of the first suit to avoid liability in the second suit."). So, under Georgia law, a party is not precluded from attempting another demand letter in the interim between an original suit and a later renewal action. With that handled, let's move on to the simple framework of § 33-4-6.

First, the claims must be covered under the policy. *Taylor*, 819 S.E.2d at 486 (quoting *Auto-Owners Ins. Co. v. Neilser*, 779 S.E.2d 55, 61–62 (Ga. Ct. App. 2015)). Obviously, there can't be a claim for a bad faith denial of coverage if the insurance contract doesn't provide for the coverage demanded. *Anderson*, 566 S.E.2d at 345. Second, the insured must make a demand for payment against the insurer within 60 days prior to filing suit. *Taylor*, 819 S.E.2d at 486 (quoting *Neilser*, 779 S.E.2d at 61–62). And third, the insured must prove that the insurer's failure to pay was motivated by bad faith. *Id.* However, notwithstanding those three requirements, if "the insurance company has any reasonable ground to contest the claim[,]" "penalties for bad faith are not authorized" under Georgia law. *Sto*, 802 S.E.2d at 456.

At the case stands, it is still to be seen if each of the 21 claims are covered by the policy.[9] But the Receiver alleges that National Union's "denial of the Claims was frivolous and unfounded." [Doc. 1, ¶ 209]. While many of the Receiver's allegations

---

[9] To be clear, a question regarding coverage is enough to warrant caution on a bad-faith claim. *Cf. Bennett Int'l Grp., LLC v. Allied World Specialty Ins. Co.*, No. 1:21-CV-2190-MLB, 2022 WL 94525, at *6 (N.D. Ga. Jan. 10, 2022).

regarding bad faith are lean on facts and conclusory,[10] the Court is not convinced that

the issue of bad faith should be decided at such a preliminary stage. Indeed, bad-faith

claims are inherently fact-specific and often require evidence and arguments not

presently before the Court.[11] *Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*, 248 F.R.D. 298,

313 (N.D. Ga. 2008); *Stegall v. Guardian Life Ins. Co. of Am.*, 320 S.E.2d 575, 576 (Ga. Ct.

App. 1984). Therefore, the Court **DENIES** National Union's Motion with respect to the

Receiver's bad-faith claims.[12]

### D.    Damages

National Union also asks the Court to dismiss the Receiver's claims for punitive

damages, attorneys' fees, and indirect or consequential damages. [Doc. 5-1, pp. 22–24].

---

[10] *See, e.g.*, [Doc. 1, ¶ 207–210 ("Plaintiffs made valid Claims for coverage under the Policy. Defendant engaged in a policy to circumvent payment of validly owed amounts. Defendant's denial of the Claims was frivolous and unfounded. Defendant's blanket refusal to pay any amounts on the Claims was unjustified.")]; [*id.* at ¶ 215 ("Defendant acted in bad faith, which caused Plaintiffs additional losses. Defendant is therefore liable for compensatory damages in the amount of the losses claimed, attorneys' fees, and statutory penalties in the amount of fifty percent (50%) of Defendant's liability for the losses.")].

[11] National Union argues that it did not act in bad faith because the Receiver failed to provide "many documents" it requested in reviewing the claims. [Doc. 5-1, p. 22]. The Court understands that an insurance company needs certain documents before determining coverage, but in these unique circumstances, where the Receiver informed National Union of his trouble in collecting certain documents due to the very theft at issue, National Union's lack-of-paperwork defense isn't as strong as it would be under other facts. *Cf. Hufstetler v. Int'l Indem. Co.*, 359 S.E.2d 399, 402 (Ga. Ct. App. 1987) ("The insurer here had sufficient documentation before it to know that a claim was being made, yet the evidence is undisputed the appellee took no action to verify the claim on the documents it was given by appellant or to seek out the information it needed to verify that claim.").

[12] Just because the Court allowed the Receiver's bad-faith claims to escape this Motion, this Order shouldn't be read as the Court's tipping of its hand as to how it might treat these claims at a later stage of the case. The Court will decide that at a later day with a much better developed factual background and different standards.

The Court begins with the easiest. In his Response, the Receiver withdrew the portion of his prayer for relief seeking punitive damages. [Doc. 12, p. 15]. Accordingly, the Court **DISMISSES** the Receiver's claim for punitive damages **without prejudice**.

As to the Receiver's claim for attorneys' fees, National Union argues that § 33-4-6 displaces any claim for fees under O.C.G.A. § 13-6-11, such that the latter should be dismissed. [Doc. 5-1, pp. 23–24]. The Receiver counters, arguing that National Union "does not dispute that plaintiffs are entitled to an award of attorneys' fees if they succeed on their claim under [§ 33-4-6]," and that since there is no pending fee petition under § 13-6-11, the Court should disregard National Union's arguments. [Doc. 12, p. 16]. But, Georgia law is clear that a "claim for attorneys['] fees and litigation expenses under O.C.G.A. § 13-6-11 [is] barred by O.C.G.A. § 33-4-6, which provides insureds the exclusive procedure to recover attorneys['] fees." *Powers v. Unum Corp.*, 181 F. App'x 939, 944 (11th Cir. 2006); *McCall v. Allstate Ins. Co.*, 251 Ga. 869, 871 (Ga. 1984) ("We therefore conclude that where the General Assembly has provided a specific procedure and a limited penalty for noncompliance with a specific enactment (e.g., uninsured motorist coverage), the specific procedure and limited penalty were intended by the General Assembly to be the exclusive procedure and penalty, and recovery under general penalty provisions will not be allowed. This conclusion is equally applicable to § 33-4-6[.]"). Accordingly, the Court **DISMISSES** the Receiver's claim for attorneys' fees to the extent he relies on § 13-6-11.

Finally, National Union asserts that the Receiver's claims for indirect or consequential damages is excluded from the policy's coverage. [Doc. 5-1, p. 24]. The exact provision *excludes* the following:

Loss that is an indirect or consequential result of an **Occurrence** covered by this **Crime Coverage Section** including, but not limited to, loss resulting from:

(i) the **Insured's** inability to realize income that the **Insured** would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**;

(ii) payment of damages of any type for which the **Insured** is legally liable; provided, however, the **Insurer** will pay compensatory damages arising directly from a loss covered under this **Crime Coverage Section**; or

(iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Section**.

[Doc. 5-2, p. 56]. National Union argues that the Receiver's Complaint seeks these exact types of damages. [Doc. 5-1, p. 24]; [Doc. 1, ¶ 204 ("As a direct and proximate result of Defendant's breach, Plaintiffs suffered substantial damages, including, but not limited to, the loss of monies owed under the Policy for the Claims, delay in payments to creditors from the Receivership Estate, incidental costs, and legal fees."). The Receiver asserts that the policy actually allows for these types of damages because the "language expressly provides that National Union will pay any 'costs, fees or other expenses' that the Insured incurs in establishing either the existence or the amount of its loss." [Doc. 12, p. 16]. The Court doesn't see it that way.

The third subsection—which the Receiver cites—is an additional exclusion, not a

28

permitted type of damages. *See* [Doc. 5-2, p. 56 (excluding a "Loss that is an indirect or a consequential result of an **Occurrence** covered by this **Crime Coverage Section** including, but not limited to, loss resulting from: . . . (iii) payment of costs, fees or other expenses the **Insured** incurs in establishing either the existence or the amount of loss under this **Crime Coverage Section**." (cleaned up))]. That language is about as clear as a policy can get in excluding the types of damages the Receiver seeks here.

The Receiver argues that his claims for compensation due to the "delay in payments to creditors from the Receivership Estate," should survive because the terms "indirect" and "consequential" are not defined in the policy. [Doc. 12, p. 16]. But, it appears that those damages are the same ones disposed of above, just labeled differently. At the end of the day, the Receiver is not seeking compensation for "damages arising directly from a loss covered under this **Crime Coverage Section**," but is instead seeking remote damages based on National Union's actions after the alleged covered incidents. [Doc. 5-2, p. 56 (Exclusion 3(f)(ii))]. Those damages are excluded from the policy. Accordingly, the Court **DISMISSES** the Receiver's claims for indirect or consequential damages.

## CONCLUSION

Based upon the foregoing, the Court **GRANTS** National Union's Motion to Dismiss [Doc. 5] **in part**. The Court **DISMISSES** all claims asserted by Monroe Capital (including any bad faith claim resulting from any denial of its claims) and

**TERMINATES** it as a party to this case. The Court also **DISMISSES** the Receiver's

claims arising under Insuring Agreement 1.D (except the Birmingham Culinary

incident),[13] and those based on O.C.G.A. § 13-6-11, as well as his claims for punitive and

indirect/consequential damages. The Court **DENIES** National Union's Motion as to all

other matters. The Court will schedule an in-person status conference to discuss further

proceedings.

　　　　**SO ORDERED**, this 21st day of August, 2024.

　　　　　　　　　　　　　　　S/ Tilman E. Self, III
　　　　　　　　　　　　　　　**TILMAN E. SELF, III, JUDGE**
　　　　　　　　　　　　　　　**UNITED STATES DISTRICT COURT**

---

[13] As discussed *supra*, National Union does not contest—for purposes of its Motion to Dismiss—that the Receiver plausibly alleged coverage under Insuring Agreement 1.D for this incident. [Doc. 5-1, p. 17].